UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>– *against* –<br><br>PEACHES STERGO,<br><br>Defendant. | **OPINION & ORDER**<br><br>23-cr-20 (ER) |

RAMOS, D.J.:

     Peaches Stergo was charged in a one-count indictment on January 12, 2023 with wire fraud in violation of 18 U.S.C. § 1343.  On April 14, 2023, she entered a plea of guilty to the indictment.  Sentencing is scheduled for July 27, 2023.  Before the Court is Stergo's letter motion to compel the production of unredacted versions of four Federal Bureau of Investigation ("FBI") form FD-302s, [1] which the government has, to date, produced only in redacted form.  For the reasons set forth below, the motion is DENIED.

**I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY**

    **A.  The Offense**

     Stergo is resident of Florida.  Doc. 2 ¶ 2.  In approximately 2016 or 2017, when she was about 30 years old, she met an 87-year-old Holocaust survivor ("the Victim"), then a resident of Manhattan, on a dating website.  *Id.* ¶¶ 1–2  In early 2017, Stergo falsely informed the Victim that she had settled a personal injury lawsuit from injuries she suffered during a car accident, but her lawyer would not release the settlement funds unless he received a certain amount of money.  *Id.* ¶ 3.  She asked the Victim if she could borrow from him to pay the lawyer.  *Id.*  Bank records show that the Victim wrote a check

---

[1] Form FD-302 is the form the FBI uses to memorialize interviews.  *Glossary: FBI's Interview Report Form FD-302* (THOMSON REUTERS PRACTICAL LAW), https://us.practicallaw.thomsonreuters.com/w-015-5755 (last accessed May 11, 2023).  Typically, FBI agents take handwritten notes during the interview, which are later incorporated into the 302s along with any additional recollections, the date and place of the interview, and the name of the agent and interviewee.  *Id.*  Form 302s do not contain a verbatim account of the interview.  *Id.*

to Stergo in May 2017 for $25,000. *Id.* After receiving this check, Stergo told the Victim that the settlement funds were deposited into her account at TD Bank. *Id.* ¶ 4. Records of Stergo's bank accounts show she never received any proceeds from an injury settlement. *Id.*

Over the next four-and-a-half-years, from May 2017 to October 2021, Stergo repeatedly extracted more money from the Victim through false misrepresentations. *Id.* ¶ 5. For example, after Stergo deposited each check, she would tell the Victim that he could potentially lose his money and never be paid back. *Id.* She told the Victim the bank demanded more money, and her accounts were under threat of being frozen. *Id.* In this manner, she convinced the Victim to issue her almost monthly checks, often in increments of $50,000. *Id.*

In perpetuating the fraud, Stergo created a fake email to impersonate a TD Bank employee, which she used to communicate with the Victim. *Id.* ¶ 6. Stergo also created fake letters from a TD Bank employee to support her claims to the Victim that more money had to be deposited to lift the hold on her account. *Id.* Stergo then created fake invoices for the Victim to provide his bank after it began looking into the repeatedly large transfers to Stergo's account. *Id.*

The Victim continued to write checks because, relying on Stergo's misrepresentations, he feared losing all of the money he had already given her. *Id.* ¶ 5. The Victim only stopped writing checks in October 2021 after admitting to his son that he had given over his life savings to Stergo, and his son informed victim that he had been scammed. *Id.* ¶ 7. His son thereafter recorded a conversation between Stergo and the Victim during which she made fraudulent misrepresentations. Doc. 21 at 4:10–20.

The Victim ultimately wrote 62 checks—amounting to over $2.8 million—which Stergo deposited in her accounts. Doc. 2 ¶ 5. Because of Stergo's fraud, the Victim lost his life savings and was forced to give up his apartment. *Id.* ¶ 8. Stergo on the other

hand, lived lavishly, purchasing a home in a gated community, numerous cars, a boat and expensive clothing and jewelry. *Id.* ¶ 9.

### B. Indictment, Arrest, and Prosecution

On January 12, 2023, Stergo was charged in an indictment with one count of wire fraud pursuant to 18 U.S. Code § 1343. Doc. 2. The indictment charged that she defrauded the Victim by falsely claiming that, if he did not deposit money into her account, she would lose all the money already deposited. *Id.* ¶ 10.

Two weeks later, on January 25, 2023, Stergo was arrested in the Middle District of Florida. Minutes Entry January 26, 2023. She was arraigned February 2, 2023 and pled not guilty. Doc. 7. At the arraignment, the Government stated that, after a protective order is entered, it planned to produce the bulk of the Rule 16 discovery to Stergo by the next day. Doc. 21 at 4:7–9. Specifically, the Government indicated that the discovery it planned to make available to Stergo included email communications, fake invoices and fake letters created by Stergo, audio recordings of Stergo making fraudulent misrepresentations, Stergo's bank statements, along with warrants and photographs of Stergo's home. *Id.* at 4:10–6:13. The Government also planned to give Stergo "excerpts of interviews of the [V]ictim and family members." *Id.* at 5:2–3.

Stergo withdrew her not guilty plea and entered a guilty plea on April 14, 2023. Minutes Entry April 14, 2023. Sentencing is scheduled for July 27, 2023. *Id.* Pursuant to the plea agreement, Stergo and the Government stipulated to certain aspects of the Federal Sentencing Guidelines, including three enhancements from the base offense level of 7: (1) a 16 level enhancement because the total loss amount was greater than $1.5 million, (2) a 2 level enhancement because the offense resulted in substantial hardship to the Victim, and (3) a 2 level enhancement because Stergo knew or should have known the Victim was a vulnerable individual. Doc. 29 at 15. With a 2-level reduction for acceptance of responsibility and a 1-level reduction for timely notice of intent to enter a guilty plea, the parties stipulated that the total offense level was 24 and that the applicable

Guidelines range was 51-63 months. *Id*. The plea agreement expressly states that "nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; [or] (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a) . . . ." *Id.* at 16.

### C. Stergo's Motion to Compel

As part of discovery, the Government produced four redacted FBI form FD-302s ("302s") summarizing interviews that agents conducted with the Victim and two of his family members. Doc. 23 (Letter Motion to Compel, "Mot.") at 1. Stergo now moves to compel the Government to provide the 302s in unredacted form, or, in the alternative, for the Court to conduct an *in camera* review of the unredacted 302s to determine if the Government complied with its discovery obligations. *Id.* Stergo argues that the unredacted 302s are "material" to sentencing because it is expected that they contain details as to the relationship between Stergo and the Victim, the nature and circumstances of the offenses, and details as to the Victim's business, health, living situation, and financial status. *Id*. at 3. Stergo intends to use the information to counter the Government's arguments regarding the application of the Sentencing Guidelines enhancements. *Id*. Moreover, Stergo contends that the redacted portions of the 302s contain information regarding factual allegations in the indictment that appear nowhere else in the discovery and will be incorporated into the presentence investigation report. *Id.* at 4. Consequently, Stergo argues that the unredacted 302s are subject to production under the Government's *Brady/Giglio* obligations. *Id.* Stergo further states she believes that "at least one case agent (presumably Richard Smythe, Jr.) will appear at sentencing as a government witness," and unredacted versions of the 302s prepared by S.A. Smythe are therefore 3500 Material. *Id*.

4

The Government responds that it has met its *Brady* and Rule 16 obligations, and it need not produce any 3500 Material because it has no plans to call any witnesses at the sentencing. Doc. 29 ("Opp.") at 4. It further states that it has made "a good-faith representation that it has met, and will continue to meet, its *Brady* and Rule 16 obligations," including producing "unredacted portions of the Interview Notes [underlying the 302s] that arguably contain *Brady* material [such as] statements by the Victim and the witnesses that suggest the relationship between [Stergo] and the Victim was, at least for a time, a bona fide, romantic relationship." *Id.* Finally, it argues that the letter motion should be filed publicly in redacted form (*id.* at 5), which Stergo does not appear to oppose, as she publicly filed her reply (Doc. 30).

## II. LEGAL STANDARD

The prosecution bears a constitutional duty to disclose evidence favorable to the accused when it is "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This duty of disclosure continues through sentencing. *Cardoso v. United States*, 642 F. Supp. 2d 251, 262 (S.D.N.Y. 2009). Evidence is "favorable" to a defendant if it tends to exculpate the defendant, *see Brady*, 373 U.S. at 88, or if it impeaches a government witness, *Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Accordingly, evidence that would mitigate a sentence is subject to disclosure under *Brady* and *Giglio*. *Cone v. Bell*, 556 U.S. 449, 474-46 (2009); *see also Cardoso*, 642 F. Supp. 2d at 262–63 (holding that failure to disclose evidence impeaching a trial witness, whose testimony was used at defendant's sentencing, undermined confidence in the defendant's sentence because the trial testimony was used to apply a three-level sentencing enhancement against defendant and prohibit her from claiming a downward adjustment). Prosecutors are encouraged to

resolve doubts as to materiality in favor of disclosure. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S., 667, 678, (1985)).

Under Federal Rule of Criminal Procedure 16, however, the Government is not required to provide "the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(2). Known as the Jencks Act, 18 U.S.C. § 3500 in turn provides that "no prior statement made by a [G]overnment witness shall be the subject of discovery until that witness has testified on direct examination." *United States v. Coppa*, 267 F.3d 132, 145–146 (2d Cir. 2001); Fed. R. Crim. P. 26.2 (incorporating the Jencks Act); *see also United States v. Seabrook*, No. 10-cr-87 (DAB), 2010 U.S. Dist. LEXIS 133565, at *9–10 (S.D.N.Y. Dec. 14, 2010) ("[T]he Jencks Act provides the exclusive procedure for discovering statements that government witnesses have given to law enforcement agencies." (quoting *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987))). After its witness testifies, upon Defendant's motion, the Government must produce to defendant any statement it possesses by the witness "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). These statements are also known as "3500 Material."

Where the Government's Due Process *Brady/Giglio* obligations (requiring production of material exculpatory and impeachment evidence) collide with its obligations under the Jencks Act (to not produce prior statements of a government witness until the witness testifies), the Government's *Brady* obligations take precedence. *Coppa*, 267 F.3d at 145-46. Therefore, if a prospective testifying Government witness' statement is material within the meaning of *Brady* and *Giglio and* contains exculpatory or impeachment evidence, it must be produced with all other *Brady* evidence. *Id.* at 146. Where the prospective Government witness' statements are *not* material within the meaning of *Brady* and *Giglio*, but are favorable to the accused, however, then the Government need only produce the statements after the witness has testified, pursuant to

Jencks. *Id.*; *see also United States v. Maxwell*, 534 F. Supp. 3d 299, 324 (S.D.N.Y. 2021). Of course, in such a situation, the Government must still abide by its *Brady* and *Giglio* obligations to produce any and all other material and favorable evidence before the proceeding (i.e., evidence as to guilt pretrial and evidence as to sentencing prior to the presentencing investigation). *See id.*[2].

Comparatively, for *nontestifying* Government witnesses, the Jencks Act is inapplicable, and the Government need not produce the witness' prior statements. *United States v. Perez*, No. 04-cr-441 (PKL), 2005 U.S. Dist. LEXIS 24444, at *10 (S.D.N.Y. Oct. 20, 2005) (citing *Jimenez-Garcia v. United States*, No. 97-cv-2911 (MBM), 1998 WL 132788, at *3 (S.D.N.Y. Mar. 24, 1998)); *see also United States v. Jackson*, 345 F.3d 59, 76 (2d Cir. 2003) (holding the Jencks Act "does not normally mandate disclosure of statements made by a person who does not testify" (citations omitted)). Thus, pursuant to the Jencks Act, the Government need not produce a non-testifying witness' prior statements beyond that which is required by *Brady* and *Giglio*. *See Perez*, 2005 U.S. Dist. LEXIS 24444, at *11–13; *see also United States v. Shyne*, 617 F.3d 103, 107-08 (2d Cir. 2010) (applying same principles to non-testifying declarants whose statements are entered into evidence against the defendant).

### III.   ANALYSIS

Form 302s are potentially subject to the Jencks Act (i.e., 3500 Material) because they record the substance of a witness' statement. *See Pizzuti v. United States*, 809 F. Supp. 2d 164, 190 (S.D.N.Y. 2011). To the extent they contain material favorable evidence that could mitigate a sentence or affect the Sentencing Guidelines, they may also be subject to disclosure under the Government's *Brady*/*Giglio* obligations. *See*

---

[2] *See also* U.S. DEP'T OF JUSTICE ("DOJ"), JUSTICE MANUAL, TITLE 9, 9-5.0001 (Jan. 2020), https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (setting forth DOJ policy regarding disclosure of exculpatory and impeachment material and timing as to the same).

*Coppa*, 267 F.3d at 146; *Maxwell*, 534 F. Supp. 3d at 324; *Cardoso*, 642 F. Supp. 2d at 262–63.

The key determination as to whether the 302s must be produced in full under Jencks is whether they are the prior statements of a testifying government witness. *Maxwell*, 534 F. Supp. 3d at 324. Although Stergo argues she suspects the Government will call at least one witness, presumably S.A. Smythe, (Mot. at 4), the Government has explicitly stated that it "does not currently anticipate or see a need to call any witnesses at [Stergo's] sentencing" (Opp. at 4). Consequently, if the Government does not call the witnesses whose interviews are summarized in the 302s, the Government need not produce the 302s under the Jencks Act. *See Perez*, 2005 U.S. Dist. LEXIS 24444, at *10. Were the Government to reverse its position and call S.A. Smythe (or another witness), the Jencks Act would require disclosure of that witness' prior statements. *See* 18 U.S.C.S. § 3500. Note, however, that the Jencks Act requires only that prior statements *of the testifying Government witness* be produced. *Id*. Consequently, even if S.A. Smythe was to testify, *his* prior statements would be brought within the ambit of the Jencks Act, but statements by the Victim or his family—the subject of the 302s at issue here—would not.

To the extent the 302s detail the relationship between Stergo and the Victim, the nature and circumstances of the offenses, and/or the Victim's business, health, living situation, and financial status, they could be material and favorable with respect to the applicable sentencing enhancements and therefore subject to production under the Government's *Brady/Giglio* obligations. *See Cardoso*, 642 F. Supp. 2d at 262–63; *Perez*, 2005 U.S. Dist. LEXIS 24444, at *11–13. But, the Government has made "a good-faith representation that it has met, and will continue to meet, its *Brady* and Rule 16 obligations," including producing "unredacted portions of the Interview Notes [underlying the 302s] that arguably contain *Brady* material [such as] statements by the Victim and the witnesses that suggest the relationship between [Stergo] and the Victim

was, at least for a time, a bona fide, romantic relationship." Opp. at 4. Where the Government makes such good-faith representations that it has complied with its *Brady/Giglio* obligations, courts generally decline to compel production absent a reason to doubt the Government's representation. *See Maxwell*, 534 F. Supp. 3d at 323; *United States v. Weigand*, 482 F. Supp. 3d 224, 244 (S.D.N.Y. 2020); *United States v. Gustus*, No. 02-cr-888 (LTS), 2002 WL 31260019, at *3 (S.D.N.Y. Oct. 8, 2002). Stergo's primary basis for suspecting that the Government has not turned over all favorable material evidence is her allegation that certain facts in the indictment are not supported by the discovery already produced. Mot. at 4. However, the facts Stergo highlights go only to the question of guilt, not to sentencing. Because Stergo has therefore not raised a credible basis to suspect the Government is not complying with its *Brady/Giglio* obligations, the Court declines to compel production of the 302s at this time. The Court therefore holds that production of the unredacted 302s is not mandated by either the Jencks Act or the Government's *Brady/Giglio* obligations.

Finally, as Stergo did not oppose the Government's request to unseal her motion to compel (*see* Opp. at 5, Doc. 30), the Government's request is granted.

### IV. CONCLUSION

For the reasons set forth above, Stergo's motion is DENIED. The Clerk of Court is respectfully directed to terminate the letter motion, Doc. 23. Stergo is further directed to refile her motion to compel unsealed, with redactions for any mention of the Victim's identity and identifying information.

It is SO ORDERED.

Dated: May 15, 2023
       New York, New York

                                                  EDGARDO RAMOS, U.S.D.J.