

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 20, 2023

**BY ECF**
Honorable Edgardo Ramos
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

  Re: **United States v. Peaches Stergo**, 23 Cr. 20 (ER)

Dear Judge Ramos:

  The Government submits this letter in advance of sentencing in this matter for defendant Peaches Stergo (the "defendant"), which is scheduled for July 27, 2023. On April 14, 2023, the defendant pled guilty to Count One of the above-referenced indictment (the "Indictment") pursuant to a plea agreement (the "Plea Agreement"). Count One charged the defendant with wire fraud, in violation of 18 U.S.C. § 1343. In the Plea Agreement, the parties stipulated to a sentencing range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") of 51 to 63 months' imprisonment (the "Stipulated Guidelines Range"). In the Presentence Investigation Report ("PSR"), the Probation Department ("Probation") agrees with the calculation of the Stipulated Guidelines Range and recommends a sentence of 36 months.

  For the reasons discussed below, an above-Guidelines sentence of 96 months' imprisonment would be sufficient but not greater than necessary to serve the purposes of sentencing.

  **A. Overview**

    i. The Offense Conduct

     a. *Overview of the Fraud*

  From in or about May 2017, up to and including at least October 2021, the defendant engaged in a scheme to defraud an 87-year-old Holocaust survivor (the "Victim") of over $2.8 million—which was his life savings.

  The defendant met the Victim approximately seven years ago on a dating website that she was using solely for the purpose of identifying a target to defraud. The defendant took trips to New York to visit the Victim at his Manhattan apartment. But, from the outset, the defendant deceived the Victim. The defendant lied and said she was a nanny in Florida. She falsely said her

name was "Alice." She did not disclose that she was in a long-term relationship with someone else, John Paul Miller. And she did not disclose that she had two kids. Instead, she worked to build the Victim's trust and affection so that she could defraud the Victim.

In 2017, after gaining the Victim's trust through lies and manipulation, she manufactured a false narrative to steal his money. The defendant lied to the Victim and said that she had received a monetary award after settling a personal injury lawsuit. She said her lawyer would not release the funds until after he received his fee. The defendant said she did not have the money and asked the Victim for a loan. The Victim, who trusted the defendant and expected to be paid back, wrote her a check for $25,000. The defendant then lied again and told the Victim that the settlement money had been successfully deposited into her bank account. In reality, the defendant never received any money from a settlement and there was no lawyer waiting on a fee. She simply stole the Victim's $25,000 and spent it on herself.

The defendant's fraudulent conduct escalated. In May 2017, the defendant told another lie: she told the Victim that her bank would not allow her to access her account—and thus the settlement money—until a certain minimum balance was reached. The defendant then asked the Victim for another loan—promising that he would promptly be paid back once she had access to her account. Again, he gave her a loan, because he trusted her. Again, she stole the Victim's money and spent it on herself, and the Victim was never paid back. This began a pattern: From May 2017 through October 2021, the defendant repeatedly lied to the Victim to induce him to send money. The Victim wrote almost monthly checks to the defendant, often in increments of $50,000. After each check was deposited, the defendant told the Victim that her bank needed more money, otherwise the accounts would be frozen, and the Victim would never be paid back. The Victim continued to write checks because he was afraid that he would never see his money again, and he thought the defendant was someone he could trust. In total, the defendant duped the Victim, who has been experiencing a cognitive decline, into writing 62 checks—totaling over $2.8 million—that were deposited into one of two accounts controlled by the defendant. He was never paid back.

      b. *The Defendant's Efforts To Perpetuate the Fraud*

The defendant went to great lengths to perpetuate her yearslong fraud scheme. When the Victim questioned why repeated deposits were necessary, the defendant created a fake email account, impersonating a TD Bank employee. She used the email account repeatedly to assure the Victim, over the course of months, that he would be repaid if he continued to deposit money into the Victim's account. One of the defendant's fake email exchanges is reproduced below:



The defendant also created fake letters from TD Bank, which she sent to the Victim. In each of these letters, the defendant made it look like a TD Bank employee was telling the defendant that there was a hold on her account which would only be lifted in many tens of thousands of dollars were deposited. One of the defendant's fabricated letters is reproduced below:



September 12th 2019
Peaches Stergo
1631 south federal highway
Pompano Beach, FL 33062

Personal checking

Account #465379809                Beginning balance $2,0054,700 Held
amounts: $2,054,700.              Ending balance:  -$2,0054,700

Dear Peaches Stergo Your receiving this letter to alert you of the account status

Once $48,000 is placed into your account, I can release wire payment amounts up to $420,000 in one business day.

Marsha.

TD Bank #461 Fort Lauderdale 33304

The defendant also created fake invoices, to make it appear as if she owned a company called "P&S Jewelry Design." She gave those fake invoices to the Victim, who had a long career as a diamond broker, to provide to his bank, which had begun questioning the large and repeated transfers of money to the defendant. In reality, P&S Jewelry Design was not real company. But the Victim was desperate. His life savings were being squandered; he increasingly could not afford his apartment, and he was being forced to borrow money from family members and friends to support himself and send money to the defendant, whom he had trusted, in the hope that the loans he had given her would be repaid. So he dutifully provided the fake invoices to his bank so that he could continue to make payments to the defendant. One of the defendant's fake invoices is reproduced below:

**P&S JEWELRY DESIGN**

**INVOICE**

Peaches Stergo
954-200-1167
www.psjewelry3.com
1635 s federal highway
pompano beach

To 
New York New York 10036

Invoice Number: personal collection. 1 of 1.

| Description | Quantity | Unit Price | Cost |
|---|---|---|---|
| 05/12/21 Polished stone #822112 | 1 | | $50,000.0 |
| 06/03/21 Polished stone #822113 | 1 | | $50,000.0 |
| 07/07/21 polished stones: #82211-822114 | 2 | 25,000 per. | $50,000.0 |
| | | Subtotal | $150,000. |
| | | Total | $150,000. |

here is the invoice you requested. As this is from my personal collection it has taken me some time to research.
Thank you for your business. All sales are finale.

Peaches Stergo

As can be seen in Exhibit A—a recording which is being attached and filed under seal—the defendant was ruthless in her lies. She assured the Victim that, "once you put the money in, in three days everything will be good," and that she was "positive" he would be reimbursed. The Victim asked the defendant how much money he had sent her, and the defendant responded "over 2 [million]." The recording was made in December 2021, with the assistance of the Victim's son, after the Victim had confided in his son about the payments he had made to the defendant.

   c.   *The Defendant Viewed Defrauding the Victim as Her "Business"*

The defendant viewed defrauding the Victim as her "business"—as she referred to the scheme in messages she sent. After her real significant other, John Paul Miller, reported that the Victim had made a deposit into the defendant's bank account, the defendant responded, "See I made money." In an August 2020 email to Miller, she once again acted as if the fraud was a business—"When I make 50k you don't say anything" she told him.

And the defendant was well aware of what her "business" actually was—a scheme to defraud the Victim of his life savings. In December 2020, she messaged Miller that the Victim was "gonna close his office up" because "[h]e needs money"—"He don't have anything else to pawn." She said, "I told [the Victim] your [*sic*] out of diamonds he said yes lol." Miller responded, "Lol lol" or "laugh out loud." The next day, the defendant said the Victim had told her he was "broke." The defendant followed up the message with "lol." Miller responded, "Lol lol did he laugh when he said that?" The defendant replied, "No lol / I did." She found the defendant's plight, which she inflicted, to be funny.

As text messages show, the defendant worked closely with Miller to commit the fraud. When the defendant said she was concerned that she had not received a wire transfer from the Victim, Miller assured the defendant it would "be fine." The defendant and Miller then discussed plans to visit the Victim—Miller offered to "drive" the defendant to New York, presumably so that she could convince the Victim to make additional payments. The defendant asked that Miller "pray" that the Victim "agrees and does it"—*i.e.*, make the payments. After the Victim made another deposit, Miller told the defendant, "Thank you King Jesus." At one point, Miller said the defendant should ask the Victim "when he's going to sell diamonds again," so that the Victim could obtain the liquidity needed to keep up with the payments demanded by the defendant.

On one occasion, in December 2020, the defendant visited the Victim in New York. She messaged Miller that she had obtained unauthorized access to the Victim's computer so that she could verify the Victim's claims that he was "broke." The defendant discovered that the Victim's bank account still had "20k" and his "fidelity [brokerage account] is 13k." Miller then asked the defendant to check the Victim's "valley National" bank account, as that was where the Victim kept "all" of his money. The defendant said she already done so—there was only "20 in valley." Later in that message exchange, the defendant said that the Victim had told her he "loved" her. The defendant thought that her successful manipulation of the Victim's emotions was humorous, following up her message with "lol." Miller responded, "Lol lol." This is just one example where the defendant secretly mocked the Victim for saying he loved her.

The defendant was hoping to expand her "business" by finding additional, vulnerable people to defraud, and there is no doubt that, but for her arrest, she would have done so. In March

2021, Miller, who was at the bank, messaged the defendant: "There is man in here sending a wire for $81,000." The defendant responded, "Young old." Miller replied, "Old / I believe he's Jewish / His last name is Abraham." The defendant asked, "How old" the man was—"60s 80s." Miller responded, "65." The defendant, who was in close proximity to the bank, was disappointed—"kind of young," she replied. Miller then sent her a photograph of the man. The defendant responded, "That man is about 55 / Too young." The defendant was coldly calculating when identifying victims vulnerable enough to fall for her scheme.

      d.  *The Fraud Unravels*

In February 2021, the defendant messaged Miller: "Well you got your way finally done with [the Victim]." Miller responded, "Don't say that." The defendant replied, "He don't have it he has 1k in his fidelity account / He asked his sons / He asked his cousi [sic] / Cousin and ex wife / He pawned all the stones he had with gia certificates / Pauly this is what you wanted / You wanted me out of this business you got your way."

By then the Victim was hundreds of thousands of dollars in debt. He had given his life savings to the defendant based on her lies and manipulation, and was forced to borrow money from family members and friends to keep up with the payments demanded by the defendant and support himself. The once successful businessman—in what should have been the comfortable period of his life—was now struggling to pay rent. Finally, in or about October 2021, the Victim confided in his son that, over time, he had given his life savings to the defendant, based on her assurance that, after each deposit, he would be paid back. The Victim's son told his father that he had been scammed. After that, the Victim stopped writing checks to the defendant.

The defendant was upset that her fraud was over. As she told Miller in November 2021: "I don't where [the Victim] is . . . I need to make money / I need to get to New York soon as [the Victim] goes back / And I need to get money." In January 2021, still reeling from the Victim having finally seen through her lies, the defendant wrote to Miller: "I am just aggravated hurt frustrated that I haven't made money I need a car so I can go look for [the Victim] too I don't want you to work like you are it's too hard." The defendant knew she had a choice: find legitimate employment and work for her money, or lie to an elderly man and steal his. Even after years of defrauding the Victim and leaving him destitute, her choice was to keep committing fraud because actually working for a living would be "too hard."

      d.  *While the Victim Lost His Life Savings, the Defendant Lived Large*

The defendant was motivated to engage in the fraud scheme by greed. At the end of the fraud, the Victim could no longer afford the rent on his apartment and was hundreds of thousands of dollars in debt. He left the country to live with his children, who now financially support him. In contrast, the defendant has lived a life of luxury with the millions she stole from the defendant: she bought a home in a gated community, a condominium, a boat, and numerous cars, including a Corvette and a Suburban. She donated, using fraud proceeds, hundreds of thousands of dollars to two churches. She transferred approximately $161,000 to Miller (which was then spent). Money was no object for the defendant. She enjoyed expensive spa excursions and regularly took expensive, luxury trips—staying at places like the Ritz Carlton, traveling to Europe, and taking spontaneous trips to Las Vegas. And the defendant spent virtually all fraud proceeds: she blew

hundreds of thousands of dollars on expensive meals, gold coins and bars, jewelry, Rolex watches, and designer clothing and jewelry from stores like Tiffany, Ralph Lauren, Neiman Marcus, Louis Vuitton, and Hermes.

    ii. Procedural History

The defendant was charged by Indictment with one count of wire fraud, in violation of 18 U.S.C. § 1343, for defrauding the Victim of his life savings of $2.8 million. (Dkt. 1). On April 14, 2023, the defendant pled guilty to Count One of the Indictment pursuant to the Plea Agreement. The Plea Agreement stipulated to an offense level of 24 and Criminal History Category of I, resulting in a Guidelines range of 51 to 63 months' imprisonment. The Plea Agreement also stipulated to a restitution amount of $2,830,775 and a forfeiture amount of $2,830,775. The defendant also agreed to forfeit a number of items seized from her residence and safety deposit box.

On June 30, 2023, the Government filed a motion (the "Motion") seeking forfeiture of the residence located at 1158 Trappers Trail Loop, Champions Gate, Florida ("1158 Trappers Trail Loop")—which was purchased with fraud proceeds. (Dkt. 37). The defendant opposes the Motion.

**B. Discussion**

    i. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

    ii. An Above-Guidelines Sentence of 96 Months' Imprisonment Is Appropriate

The Court should impose an above-guidelines sentence of 96 months' imprisonment. Such a sentence is necessary given the seriousness of the offense, the characteristics of the defendant, and the need to promote respect for the law and afford adequate deterrence to criminal conduct.

  a. *The Seriousness of the Offense*

  The seriousness of the offense and its impact on the Victim and others is difficult to overstate. The defendant sought out the Victim as a target for fraud and deceived him from the outset: lying about her name, lying about her relationship status, lying about whether or not she had kids. And she preyed on the Victim's vulnerability. The Victim was in his 80s when he met the defendant. He suffers from cognitive decline, among other health issues. He is frail. In turning to a dating website, the Victim was searching for something so fundamental—companionship and love. And the defendant exploited that vulnerability. The defendant's text messages to Miller about the Victim are jarring in their callousness. Not only did she manipulate the Victim's emotions for a period of years, she secretly mocked the Victim for saying he loved her. She thought it was hilarious that she was destroying his life for her own benefit.

  The defendant lied to Victim repeatedly, over the course of years. This was not a one-off fraud. This was not a momentarily lapse of judgment, or an aberrant episode. She could have stopped at any time. She did not. Instead, she was relentless—defrauding the Victim was her "business." She impersonated bank employees. She created a fake email account. She sent fake letters. She created fake invoices, and then cajoled the Victim to send her fake invoices to his own bank. She took trips to New York to lie to the Victim's face and manipulate him. She secretly searched the Victim's computer. She made demands of a vulnerable, elderly man. For example, when the Victim told her he was broke, she told him to sell his inventory of diamonds. And when he was out of diamonds, she told him to borrow money from others. Indeed, the impact of the defendant's crime goes beyond the Victim himself—the Victim borrowed hundreds of thousands of dollars from family members and friends who will never be paid back. And Victim's children are now his sole caregivers and are paying for the cost of his care.

  While the defendant lost everything, the defendant became a millionaire. And she spent all of that money on a home, cars, stays at the Ritz Carlton, trips to Las Vegas and Europe, and luxury purchases from the most expensive jewelers and fashion houses.

  The contrast between the defendant's life of luxury and the Victim's devastation is evident in a letter the Victim provided to the Court, attached hereto as Exhibit B. It shows the depth of his loss. A person who had already lost so much—his parents and youth to the Holocaust—was defrauded of his life savings in what should have been a comfortable period of his life. An excerpt from the Victim's letter is reproduced below:

> I am writing to the court as a victim of the devastating actions of Peaches Stergo, who, through a methodical and malicious scheme, stole $2.8 million from me, leaving me with nothing left to my name. As a Holocaust survivor, I have endured unspeakable pain and loss in my life, but never did I imagine that I would be subjected to such a heartless betrayal in my old age. At the age of six, I lost both my parents in the Holocaust, and it wasn't until I was ten that I had the opportunity to sit at a school desk for the first time. I grew up in a boarding school, surrounded by the echoes of the horrors I had experienced. Determined to make a better life for myself, I moved to the United States in my early twenties.

> Over the next 60 years, I worked tirelessly to establish a successful business, family, and home in New York. I am now 88 years old, and the last thing I expected was to finish my days in the same manner that I started them—penniless and betrayed.

For most of his life, the Victim worked hard to live the American dream, after suffering so much horror as a child. This country welcomed him and gave him an opportunity to live in peace and safety—the opportunity and stability to build a life. And that life was ruined by the defendant. The defendant's children made that clear in a letter to the Court,[1] which is attached hereto as Exhibit C:

> The defendant took advantage of our father's kindness, generosity, and advanced age. This has had a devastating impact on him and our families. Our father's life savings were stolen, which would have secured him for the rest of his life, and to an extent his children and grandchildren. Our father planned to retire, travel, and spend more time with his family. Rather, at the age of 87, he was forced to uproot his comfortable life in New York and relocate to a modest apartment closer to us in Israel. We, his family, lovingly provide logistical, financial and emotional support on a daily basis, however we cannot sufficiently underscore the difficulties around the precarious position he is in. He faces severe financial hardship and uncertainty, while simultaneously struggling to cope with the emotional trauma of being scammed out of his life's savings.

In her cruelty, the defendant did care about any of this. She found it exceedingly entertaining, at first, that the Victim was "broke"—that "[h]e don't have anything else to pawn." But when the scam was over—when the Victim was no longer sending the defendant money—she was upset, not because she felt bad for the Victim or had a sense of remorse, but because she was unwilling to earn money though legitimate employment; she preferred to be a fraudster. As she said, "I am just aggravated hurt frustrated that I haven't made money . . . I don't want to work . . . it's too hard."

---

[1] The defendant's submission erroneously says that the Victim has requested "a shorter sentence" for the defendant. (Dkt. 40 at 7). In reality, it was the defendant's children who made that request, in the hope that the defendant will start paying restitution sooner. As is evident in this submission, the Government respectfully does not agree. It is unlikely the defendant will ever pay substantial restitution. As the Court is undoubtedly aware, so many defendants fail to pay any restitution. And restitution here would be capped at 15% of the defendant's gross income. (Dkt. 28 at 2). Even if she were to make $50,000 a year, for example, the Victim would receive, at most, $7,500 a year in restitution—a paltry sum compared to his loss.

b. *The Characteristics of the Defendant*

The defendant's lack of remorse is troubling. At the change of plea proceeding, she acknowledged her culpability and said that she knew what she was doing was wrong. Nevertheless, she continues to oppose forfeiture of the residence she purchased with fraud money, 1158 Trappers Trail Loop. She wants to keep it. Actions speak louder than words, and the defendant's actions with respect to 1158 Trappers Trail Loop are not consistent with someone who is remorseful—someone who wants to make things right. She does not want to make the Victim "whole" as she claims in her sentencing memorandum (Dkt. 40 at 5); if she did, she would acknowledge that almost all of the monetary recovery available for the defendant can come from one place and one place only—the sale of 1158 Trappers Trail Loop for the benefit of the Victim.

The defendant even has the gall to claim that she had a "genuine, caring relationship" with the Victim. (Dkt. 40 at 4). The Victim does not believe that. His family does not believe that. There was a relationship to be sure, but it was a relationship based on lies. One thing needs to be clear: the defendant was motivated by only one thing—greed. It is important to remember just how cold and cruel the defendant was in defrauding the Victim. Again, she openly mocked the defendant's love for her; she laughed when she found out he was broke; she forced him to borrow hundreds of thousands of dollars from his family and friends; she drove him from his apartment; she bankrupted and devastated him. In reviewing the defendant's phone and email account, the Government did not find a single message where the defendant ever expressed any concern about the Victim's plight. And she was not going to stop with the Victim; she was looking for other elderly men to ruin too, nixing one potential victim because he was "too young." [2]

The defendant claims to be on a path to rehabilitation, by "regularly attend[ing] church and work[ing] hard to stop living 'sinfully' and doing things that would take her away from God." (Dkt. 40 at 4). She says her partner, John Paul Miller, is "her biggest supporter helping her in a spiritual aspect to get through this." (*Id.* at 5). But the defendant regularly invoked her faith in defrauding the Victim. She donated hundreds of thousands of dollars of fraud proceeds to two churches. On October 16, 2020, Miller messaged the defendant: "The [Victim] deposited the money. Thank God. I was a little concerned after we gave the tithes to this church. But God is faithful." The defendant responded with agreement: "God is faithful." At one point, the defendant messaged Miller, asking that he "pray" that the Victim "agrees" to make further payments to her account. On another occasion, after Miller texted the defendant that the Victim had "put the money

---

[2] The Government strongly disagrees with Probation's recommendation of a below-Guidelines sentence. Probation does not have access to all of the messages cited in this submission, which show the defendant's complete lack of remorse and the degree to which she schemed to completely decimate the Victim's financial and emotional well-being. While it is true the defendant has no criminal history, it is clear that she was seeking to defraud other vulnerable victims and would have done so had she not been caught. Probation also notes her past employment. While the defendant claims to have been working for Kingdom Business LLC, the Government has found no evidence that she was actively working in this business—to the extent it can be called that. Throughout the time of the fraud, bank records show that Kingdom Business LLC made little money; the defendant and her significant other, John Paul Miller, were living off the money they were stealing from the Victim.

in [her account] ty Jesus," the defendant responded, "Thank you Jesus." In June 2021—towards the end of the fraud and at a time the defendant was struggling to afford his apartment—the defendant was arranging tickets to Greece. In an email, she told her travel agent she wanted to spend between $12,000 and $14,000 for the vacation—insisting on a hotel room on the island of Santorini with "ocean views and private spa tub." She ended the email—"God is good!"

      b. *The Need To Afford Adequate Deterrence and Protect the Public from Further Crimes of the Defendant*

Romance scams have destroyed the lives of countless vulnerable, elderly Americans like the Victim here. A New York Times article from February 2023, which discussed, in part, this case, noted that, in 2020, scammers defrauded over $139 million from adults age 60 and older in romance scams, up from $84 million the year before.[3] The median loss from these scams for people 70 and older in 2021 was $9,000, compared with $2,400 across all age groups.[4] The article additionally notes that elderly victims are targeted because they often have substantial savings.[5] Like here, some victims are forced to mortgage their houses, empty their retirement accounts, and borrow large sums of money.[6] A substantial sentence of 96 months' imprisonment would send a strong deterrence message to would-be romance scammers that their actions will have severe consequences.

   C. Conclusion

For the reasons set forth above, the Court should impose a sentence of 96 months' imprisonment.

                Respectfully submitted,

                DAMIAN WILLIAMS
                United States Attorney for the
                Southern District of New York

       by: /s/ Adam Sowlati
           Adam Sowlati
           Assistant United States Attorney
           (212) 637-2438

---

[3] Emily Schmall, *Retirees Are Losing Their Life Savings to Romance Scams. Here's What to Know*, N.Y. Times (Feb. 3, 2023), available at https://www.nytimes.com/2023/02/03/business/retiree-romance-scams.html.

[4] *Id.*

[5] *Id.*

[6] *Id.*

**CC (BY ECF)**
All Counsel of Record

# Exhibit A
# (See recording filed under seal)

# Exhibit B

Victim: ▮
USAO Number: 2022R00928
Court Docket Number: 23-CR-00020

Your Honor,

I am writing to the court as a victim of the devastating actions of Peaches Stergo, who, through a methodical and malicious scheme, stole $2.8 million from me, leaving me with nothing left to my name. As a Holocaust survivor, I have endured unspeakable pain and loss in my life, but never did I imagine that I would be subjected to such a heartless betrayal in my old age. At the age of six, I lost both my parents in the Holocaust, and it wasn't until I was ten that I had the opportunity to sit at a school desk for the first time. I grew up in a boarding school, surrounded by the echoes of the horrors I had experienced. Determined to make a better life for myself, I moved to the United States in my early twenties.

Over the next 60 years, I worked tirelessly to establish a successful business, family, and home in New York. I am now 88 years old, and the last thing I expected was to finish my days in the same manner that I started them – penniless and betrayed.

What began as a naïve loan to Mrs. Stergo spiraled into unimaginable proportions. Her deception and manipulation forced me to close my business as I was coerced into emptying it of all its assets. I had to leave my home, which I could no longer afford, and ultimately flee the country, once again, to be close to my children abroad, where they could support me in these difficult times.

This ordeal has been a devastating blow to my life, and the trauma of losing everything I worked so hard for has been unbearable. However, I would like to take this opportunity to express my sincere gratitude to the FBI and District Attorney for their dedication in restoring justice. I trust that the court will do the same and take necessary actions to impose a fitting punishment on Mrs. Stergo, while also, and equally important to me, ensuring that my life savings are reimbursed.

Your Honor, my life has been marked by unimaginable loss and hardship, but I have always found the strength to persevere. I hope that through the actions of the court, I will once again find a way to rebuild what's left of my life and find peace with my family.

Thank you for your attention to my case.

Sincerely,

▮



# Exhibit C

Victim: ███████████
USAO Number: 2022R00928
Court Docket Number: 23-CR-00020

June 7, 2023

Victim Impact Statement

Dear Honorable Judge,

We are the children of ███████████. We are writing this letter to you today in the hopes that you will consider the impact of the defendant's actions on our father, and on our families.

Our father is a kind and gentle man who has always put others before himself. He survived the Holocaust as a child by escaping Poland at the age of six and hiding in a makeshift orphanage in Hungary. He came to America after the war with nothing. And over many years, he ultimately built a successful business. He has always been generous with his time and money, and he has helped countless people in need. He has always provided support to his children and grandchildren, to one extent or another. Naturally, his past has also led him to being somewhat reclusive, and not sharing his difficulties with others.

The three of us moved to Israel following our parents' divorce to join our mother and extended family. Despite the distance, we've all stayed close to our father, seeing him at least a few times a year, if not more. We all live modest lives and none of us are independently wealthy. However, each of us are married with children, and understand nature's way of a parent needing to care for their family's well-being. Our father was also this way, but with his reclusive nature, he unfortunately opened up to us about the scam only after it was too late, and only after he felt forced to borrow money to survive.

The defendant took advantage of our father's kindness, generosity, and advanced age. This has had a devastating impact on him and our families. Our father's life savings were stolen, which would have secured him for the rest of his life, and to an extent his children and grandchildren. Our father planned to retire, travel, and spend more time with his family. Rather, at the age of 87, he was forced to uproot his comfortable life in New York and relocate to a modest apartment closer to us in Israel. We, his family, lovingly provide logistical, financial and emotional support on a daily basis, however we cannot sufficiently underscore the difficulties around the precarious position he is in. He faces severe financial hardship and uncertainty, while simultaneously struggling to cope with the emotional trauma of being scammed out of his life's savings.

We are concerned that the defendant has shown no remorse for her actions. She has requested to keep the house she bought with our father's money, and she has squandered most of the

scammed proceeds on luxuries and frivolous items. We believe this unconscionable behavior has demonstrated a complete disregard for the severity of her unscrupulous actions and the disastrous impact that her crime has had on our father and our broader family.

We respectfully request that the defendant be ordered to restitute our father with the full $2.8 million, as well as interest and punitive damages, should you determine it appropriate. Assuming these funds are not immediately available, we request our father receive ownership of her home and all remaining assets up to the restitution obligation, and that Ms. Stergo be encouraged to return to work as soon as possible with her wages being garnished by the maximum amount until full restitution, even if it means a shorter sentencing.

Thank you for your time and consideration.

Respectfully,

The Children of ███████████████████